This Opinion is a
Precedent of the TTAB

Mailed: September 11, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

—————

Trademark Trial and Appeal Board

—————

*Schiedmayer Celesta GmbH*

*v.*

*Piano Factory Group, Inc. and Sweet 16 Musical Properties, Inc.*

———

Cancellation No. 92061215

———

Michael J. Striker of Collard & Roe, PC
  for Schiedmayer Celesta GMBH.

Adam Stephenson of IPTechLaw
  for Piano Factory Group, Inc. and Sweet 16 Musical Properties, Inc.

—————

Before Taylor, Adlin and Pologeorgis,
  Administrative Trademark Judges.

Opinion by Adlin, Administrative Trademark Judge:

Respondent Sweet 16 Musical Properties, Inc. ("Sweet 16") (by assignment from co-Respondent Piano Factory Group, Inc. ("Piano Factory")) owns a registration for the mark SCHIEDMAYER in typed form for "pianos, namely, upright pianos, grand pianos, and digital pianos."[1] In its third amended petition for cancellation, 34

---

[1] Registration No. 3340759, issued November 20, 2007; Section 8 affidavit accepted and Section 15 affidavit acknowledged; renewed (the "Registration").

TTABVUE,[2] Petitioner Schiedmayer Celesta GmbH ("Schiedmayer") alleges that it is the "successor in interest to the trademark SCHIEDMAYER dating to its origin in the year 1735," and that beginning well prior to Respondents' first use of the involved mark, "Schiedmayer and its predecessors in interest have manufactured and sold Schiedmayer keyboard instruments" worldwide, including in the United States. As grounds for cancellation, Petitioner alleges that Respondents' use of SCHIEDMAYER falsely suggests a connection with Petitioner under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), and that Respondents abandoned the involved mark based on nonuse with intent not to resume use.[3] In their answer, Respondents admit that they have no connection to Petitioner, but otherwise deny the salient allegations in the third amended petition for cancellation; they also assert the affirmative defenses of laches and acquiescence.

## I. The Record

The record consists of the pleadings and, by operation of Trademark Rule 2.122(b), the file of Sweet 16's involved Registration. In addition, Petitioner introduced:

> Notice of Reliance ("Pet. NOR") on Respondent's discovery
> responses and initial disclosures. 37 TTABVUE.[4]

---

[2] Citations to the record reference TTABVUE, the Board's online docketing system. The number preceding "TTABVUE" corresponds to the docket entry number(s), and any number(s) following "TTABVUE" refer to the page number(s) of the docket entry where the cited materials appear.

[3] Petitioner asserted a separate abandonment claim based on Piano Factory rather than Sweet 16 signing the Section 8 declaration submitted to maintain the Registration, but has withdrawn this claim. 75 TTABVUE 13 (Petitioner' Trial Brief at 8).

[4] We have considered Respondents' written discovery responses, but not the unauthenticated documents Respondents produced in response to Petitioner's document requests. Trademark Rule 2.120(k)(3)(ii) ("A party that has obtained documents from another party through

2

> Testimony Declaration of Elianne Schiedmayer, Petitioner's Chief Executive Officer, and the exhibits thereto ("Schiedmayer Dec."). 38-39 TTABVUE.
>
> Testimony Declaration of Olga Fuchs, an administrator with Petitioner's law firm, and the exhibits thereto ("Fuchs Dec."). 40 TTABVUE.
>
> Testimony Declaration of Helga Kasimoff, a co-owner of Kasimoff-Blüthner Piano Co., and the exhibits thereto ("Kasimoff Dec."). 41 TTABVUE.
>
> Discovery deposition of Glenn Treibitz, Respondents' principal and "main shareholder," and the exhibits thereto ("Treibitz Disc. Tr."). 42 TTABVUE.
>
> Oral cross-examination of Mr. Treibitz (concerning his testimony declaration) ("Treibitz Test. Tr."). 71 TTABVUE.
>
> Rebuttal NOR on printed publications and Internet printouts. 72 TTABVUE.
>
> Rebuttal declaration of Ms. Schiedmayer and the exhibits thereto ("Schiedmayer Rebuttal Dec."). 73 TTABVUE.
>
> Rebuttal declaration of Michael Floymayr, a German patent attorney, and the exhibits thereto ("Floymayr Rebuttal Dec."). 74 TTABVUE.

Respondents introduced:

> Notice of Reliance on Petitioner's discovery responses,[5] and Trademark Office and Board records relating to uninvolved application Serial No. 73475680 and Opposition No. 91073054 between Petitioner and a third party ("Resp. NOR."). 65 TTABVUE.

---

disclosure or under Rule 34 of the Federal Rules of Civil Procedure may not make the documents of record by notice of reliance alone, except to the extent that they are admissible by notice of reliance under the provisions of [37 C.F.R.] § 2.122(e) or the party has obtained an admission or stipulation from the producing party that authenticates the documents.").

[5] For the reasons explained in footnote 4, we have not considered the documents Petitioner produced in response to Respondents' document requests, unless separately authenticated.

Testimony declaration of Russell Kassman, founder and Chief Executive Officer of Lewent Enterprises LLC DBA R. Kassman Piano ("Kassman Dec."). 66 TTABVUE.

Testimony declaration of Mr. Treibitz, and the exhibits thereto ("Treibitz Dec."). 66 TTABVUE.

## II. Facts of Record

Petitioner manufactures and sells "a keyboard musical instrument known as a Celesta." 38 TTABVUE 4 (Schiedmayer Dec. p. 1).[6] Celestas have much in common with pianos, but rather than striking wires, as piano keys do, celesta keys strike a metal plate to make sounds:



*Id.* at 17. Notwithstanding this specific difference, a celesta "generally resembles a piano and is played as a piano would be played," as depicted in the advertisement below:

---

[6] Neither party numbered the paragraphs in any of the testimony declarations.



*Id.* at 5, 18 (Schiedmayer Dec. p. 2 and Ex. A).

Petitioner and its CEO Ms. Schiedmayer are connected to the German Schiedmayer family and the Schiedmayer family businesses known for offering musical keyboard instruments, including pianos and celestas, throughout the world. *Id.* "The first Schiedmayer musical keyboard instrument was a clavichord manufactured by Balthasar Schiedmayer in 1735." *Id.* More than 200 years after Balthasar Schiedmayer manufactured his first clavichord, Elianne Schiedmayer's late husband, Georg Schiedmayer, inherited the Schiedmayer family-affiliated business Schiedmayer & Soehne from his father. *Id.*

Eventually, in 1980, Georg Schiedmayer "closed down the production of the Schiedmayer pianos in Stuttgart," and renamed the company Schiedmayer GmbH & Co. KG. *Id.* at 6 (Schiedmayer Dec. p. 3). "In 1980, a joint venture company [had] been created with Rud. Ibach GmbH in order to have Schiedmayer pianos manufactured

by the firm Ibach in Germany," but that relationship ended quickly, and Georg Schiedmayer decided in 1980 to specialize in celestas. *Id.* "[T]he trademark SCHIEDMAYER was never sold, licensed, assigned or in any way transferred to Rud. Ibach & Sohn," however. 73 TTABVUE 5 (Schiedmayer Rebuttal Dec. p. 2).[7] In any event, "at some time in the 1990's, Rud. Ibach & Sohn nevertheless started a cooperation with the Kawai Company and some pianos were manufactured by Kawai under a false SCHIEDMAYER trademark. These sales continued for a short period of time and were then discontinued. Kawai never obtained any right or license or assignment of any type of the SCHIEDMAYER trademark …." *Id.* Mr. Floymayr, the German patent attorney, testified that based on his search of German trademark registrations, "no company bearing the name [Rud. Ibach & Sohn or] Ibach ever obtained any rights to the trademark SCHIEDMAYER in Germany, either by original filing, by assignment or any other transfer." 74 TTABVUE 4-15 (Floymayr Dec. p. 1 and Ex. A).

Georg Schiedmayer died in 1992 and Elianne Schiedmayer was his sole heir. 38 TTABVUE 7, 29-31 (Schiedmayer Dec. p. 4 and Ex. C). She is now sole owner of Schiedmayer GmbH & Co. KG, the current name of "Schiedmayer & Soehne GmbH founded in 1809 by Johann Lorenz Schiedmayer in Stuttgart, Germany." 73 TTABVUE 4 (Schiedmayer Rebuttal Dec. p. 1). In addition, Ms. Schiedmayer founded Petitioner in 1995. Petitioner claims to be the only current producer of celestas that

---

[7] It is not clear that "Rud. Ibach GmbH" (referenced in Ms. Schiedmayer's original declaration) is the same as "Rud. Ibach & Sohn" (referenced in her rebuttal declaration), but this is ultimately immaterial to our decision.

meet the specifications developed by the celesta's inventor. 38 TTABVUE 7-8 (Schiedmayer Dec. pp. 4-5); 73 TTABVUE 4 (Schiedmayer Rebuttal Dec. p. 1).

Ms. Schiedmayer testified, with support from Petitioner's invoices and those of its distributors, that Petitioner began offering celestas in the United States prior to Respondent's first use of the involved mark. 38 TTABVUE 9, 77-220 (Schiedmayer Dec. p. 6 and Ex. F). Ms. Kasimoff testified that her Los Angeles piano store, Kasimoff-Blüthner Piano Co., "imported our first Schiedmayer Celesta in 1967 and since 1967 we have continuously offered for sale and rental Schiedmayer Celestas in the United States." 41 TTABVUE 11 (Kasimoff Dec. p. 1). The following are representative advertisements for Petitioner's celestas which predate Respondents' first use of SCHIEDMAYER:



Id. at 236, 253. "[M]ost orchestras in the United States … have purchased and are currently using at least one Schiedmayer Celesta," including the New York Philharmonic Orchestra, Boston Symphony Orchestra, Cleveland Orchestra, Los

Angeles Philharmonic, San Francisco Symphony and many others. 38 TTABVUE 10, 71-75 (Schiedmayer Dec. p. 7 and Ex. E); 41 TTABVUE 4-5 (Kassimoff Dec. p. 1-2).

The Wikipedia entry for "Schiedmayer" indicates that it "is the name of a German Instrument-manufacturing family. Established in 1735 as a keyboard instrument manufacturer, it is still active today as a family business." 40 TTABVUE 8 (Fuchs Dec. Ex. A). Google searches for "Schiedmayer" or "Schiedmayer celesta" yield results that almost exclusively refer to Petitioner, the Schiedmayer family or Schiedmayer keyboard instruments. *Id.* at 4, 13-35 (Fuchs Dec. p. 1 and Exs. B and C).[8] From the second half of the 19th century through the first half of the 20th, keyboard instruments manufactured by the Schiedmayer family and its affiliated companies won many awards and gained worldwide notoriety. 38 TTABVUE 10 (Schiedmayer Dec. p. 7). A 1796 Schiedmayer clavichord is on display in the permanent collection of the Boston Museum of Fine Arts. *Id.* at 11 (Schiedmayer Dec. p. 8). Ms. Kassimoff testified that she is "aware that the reputation and fame of Schiedmayer musical instruments dates back almost 300 years and that Schiedmayer Celesta GmbH and Elianne Schiedmayer represent the continuum of a history relating to the sale of keyboard musical instruments dating back almost 300 years." 41 TTABVUE 7 (Kassimoff Dec. p. 4); *see also* 38 TTABVUE 22, 26-27 (Schiedmayer Dec. Ex. B, *Musikinstrument*

---

[8] We have not relied on this Internet evidence for the truth of the matters asserted therein, but only for what it shows on its face. Specifically, we have considered what these sources state, rather than the truth of what they state.

8

article Ms. Schiedmayer testified is "true and correct" entitled "The Heavenly Piano Builders").

Respondent Sweet 16 is a Los Angeles piano dealer which claims to have acquired all of Respondent Piano Factory's assets in 2006.[9] 66 TTABVUE 6 (Treibitz Dec. p. 1). The Registration issued the following year, and in 2016 Respondents recorded an assignment of the Registration to Sweet 16. Sweet 16 now uses both "Piano Factory" and "Hollywood Piano" as DBAs. *Id.* Respondents are retailers, and do not manufacture pianos. 37 TTABVUE 7 (Respondents' Response to Petitioner's Interrogatory No. 5).

Respondents' owner and president Mr. Treibitz has "been involved with piano fortes (pianos) since 1981 as a performing artist and in working in every facet of the piano business from sales and marketing to hands on rebuilding in a piano rebuilding shop." 66 TTABVUE 6 (Treibitz Dec. p. 1); 71 TTABVUE 7 (Treibitz Test. Tr. 4); 37 TTABVUE 132 (Respondents' Initial Disclosures). He has also "been involved in the sale and rental of approximately 50,000 pianos, including nearly all major piano brands being manufactured today and many historical brands no longer under manufacture." 66 TTABVUE 6 (Treibitz Dec. p. 1).

In 2001, Mr. Treibitz had an "understanding," apparently based on Kawai no longer selling SCHIEDMAYER-branded pianos, that the SCHIEDMAYER mark had been abandoned in the United States for pianos. *Id.* at 9 (Treibitz Dec. p. 4). Piano

---

[9] Reel/Frames 5866/0016 and 5866/0019. Sweet 16 was joined as a co-defendant by the Board's December 21, 2016 order. 33 TTABVUE 21-22.

Factory filed its application to register the mark the following year, and the application subsequently matured into the involved Registration.

Respondents merely sold, but did not manufacture, pianos bearing the SCHIEDMAYER mark, however. "[T]he practice at Hollywood Piano was that when a SCHIEDMAYER branded piano was needed on the showroom floor, we often selected a quality piano from those in our warehouse that was a 'no name' or unbranded piano manufactured by companies like American Sejung Corporation (ASC) and placed our SCHIEDMAYER brand nameplate on it." *Id.* In fact, all "Schiedmayer" pianos Respondents have ever sold were bought "as no-name pianos from China," and Respondents affixed SCHIEDMAYER labels to each of them. 71 TTABVUE 30 (Treibitz Test. Tr. 27). Respondents purchased the "SCHIEDMAYER" labels from trophy stores and decal makers. *Id.* at 31 (Treibitz Test. Tr. 28).

Respondents' practice of buying unbranded, "no-name" pianos from China and later branding them with marks of unaffiliated manufacturers is apparently not uncommon in the keyboard instrument industry. The no-name pianos are known in the industry as "stencil pianos," and Mr. Treibitz agrees that "[a] classic example of stencil pianos is when manufacturers produce a cheap-end piano that has a German sounding name." *Id.* at 36, 40 (Treibitz Test. Tr. 33, 37). Mr. Treibitz also agrees that Respondents "are selling a relatively cheap no-name Chinese piano as a Schiedmayer piano." *Id.* at 41 (Treibitz Test. Tr. 38). As summarized in The Complete Idiot's Guide to Buying a Piano, which Mr. Treibitz testified was written by two of his former employees, 70 TTABVUE 40 (Treibitz Test. Tr. 37):

10

> Not all pianos are what they appear to be. For decades, some manufacturers have built generic, lower-quality pianos for distributors and retailers with a variety of names stenciled on the front. These are called *stencil pianos*. Often the stenciled name sounds close to that of a more famous and recognizable brand. Frequently these names come from old, defunct American companies that still command some recognition in the marketplace. Names are usually chosen because they sound American or German, even though the piano may be made in Indonesia or mainland China … Unsuspecting customers see that name on a piano and assume they are getting great value, when in fact, the actual instrument may or may not be at the level of quality that name implies.

72 TTABVUE 9. *See also id.* at 12-13 (separate article mentioning use of "Schiedmay**a**r" as an example of a stenciled name which "sounds like Schiedmayer & Soehne") and 15-17. According to Ms. Schiedmayer, "[t]he sale of cheap 'no name' pianos manufactured in China and Indonesia under the great name Schiedmayer diminishes and violates the fame and reputation of my name and the name of my company and one of the great names in musical keyboard instruments …." 73 TTABVUE 7 (Schiedmayer Rebuttal Dec. p. 4).

Mr. Treibitz testified that Sweet 16 sold "approximately 29" pianos bearing the SCHIEDMAYER mark from 2007-2018. 66 TTABVUE 10 (Treibitz Dec. p. 5). The quantity is approximate, and not supported by business records, "[d]ue to data losses resulting both from migration of my record keeping software and due to losses suffered from computer system failure." *Id.* at 9 (Treibitz Dec. p. 4). Rather, the figures are based on a "general recollection." 71 TTABVUE 25 (Treibitz Test. Tr. 22).

Mr. Treibitz further testified, in conclusory fashion, that Sweet 16 never intended to discontinue use of the SCHIEDMAYER mark, and never discontinued use of the

11

mark with an intent not to resume use. 66 TTABVUE 10 (Treibitz Dec. p. 5). Instead, over the past three years, Mr. Treibitz has "been working diligently (including traveling to China on multiple occasions) to evaluate Chinese piano manufacturers to make pianos suitable for sale under the SCHIEDMAYER brand line." *Id*. at 11 (Treibitz Dec. p. 6).

Respondents advertise their pianos bearing the SCHIEDMAYER mark by touting their "German strings" as shown below:



*Id.* at 48 (Treibitz Dec. Ex. 12).

Mr. Treibitz acquired the "schiedmayer.com" domain name in 2002, and since that time a "DNS redirect" has redirected those accessing "schiedmayer.com" to Hollywood Piano's website. *Id.* at 9, 11 (Treibitz Dec. pp. 4, 6); 40 TTABVUE 5, 66 (Fuchs Dec. p. 2 and Ex. H). In addition, Mr. Treibitz owns the domain names "ritmuller.com," "voseandsons.com" and "shoninger.com," and applied to register VOSE & SONS as a trademark for "pianos, namely, upright pianos, grand pianos, and digital pianos; piano keyboard instruments."[10] 40 TTABVUE 5, 60-67 (Fuchs Dec. p. 2 and Ex. H); 42 TTABVUE 39-41, 148 (Treibitz Disc. Tr. 36-38 and Ex. 8); 66 TTABVUE 12 (Treibitz Dec. p. 7). Ritmuller, Vose and Sons and Shoninger are, or at least were, piano manufacturers, and Respondents apparently use their names in connection with stencil pianos, the same way they use SCHIEDMAYER. 42 TTABVUE 36-42, 54-57 (Treibitz Disc. Tr. 33-39, 51-54). Respondents advertise these brands as well as their SCHIEDMAYER stencil pianos on their website:

---

[10] Application Serial No. 78157550. Mr. Treibitz testified that after his application to register the mark VOSE & SONS was refused and eventually abandoned, another company, Wrightwood Enterprises, registered the same mark. He further testified that "[i]t is my belief that Wrightwood Enterprises, Inc. had knowledge of my application and its status and strategically made their filing to ensure they were able to prevent my adoption of the mark after the *ex parte* appeal failed (i.e., 'stole' the trademark from me). This is because I am unaware of any association between Wrightwood Enterprises, Inc. and any of the former users of the VOSE & SONS trademark." 66 TTABVUE 12 (Treibitz Dec. p. 7).



Hollywood Piano Company, Est. 1928 - Los Angeles, CA - Piano Sales, Piano Rentals, for Los Angeles, Burbank, Glendale, Pasadena, and all of Southern California

*Live Performance* Model LX

Hollywood Piano is one of the largest piano dealers in the Los Angeles Metro area serving the San Fernando Valley, San Gabriel Valley, Vetura County, Conejo Valley, Orange County, San Bernardino County, Riversdie County, Inland Empire, Lancaster, Palmdale, Burbank, Glendale, Pasadena, Hollywood, West Hollywood, Arcadia, San Moreno, Alhambra, Monterey Park, Baldwin Hills, West Covina, Walnut, Diamond Bar, Eastvale, Duarte, Hancock Park, Culver City, West LA, Santa Monica, Westwood, Brentwood, Beverly Hills, South Bay, Redondo Beach, Manhattan Beach, Palos Verdes, Long Beach, and North Hollywood. Hollywood Piano is the largest Baldwin piano dealer in the United States of America. Our Company sells new pianos, used pianos, and is the largest piano rental agency in the Los Angeles metropolitan region. The models of new and used acoustic pianos that it sells include Steinway & Sons, Mason & Hamlin, Seiler, Estonia, Albert Weber, Brodmann, Steingraeber, Sohmer, Knabe, Young Chang, Petrof, Pleyel, Weber, Bergmann, Falcone, George Steck, Hobart M. Cable, Brodmann, Schiedmayer, Bernard Shoninger, Kawai, Yamaha, Samick, Chares Walter, Shigeru Kawai, Schimmel, Perzina, Star, Hallet & Davis, Kingsburg, Chickering, Kimball, Boston, Essex, Kohler & Campbell, Bosendorfer, Bechstein, Bohemia, Fazioli, Bluthner, Vose and Sons, Kurtzmann, Pramberger, Story & Clark, Hallet & Davis, Knabe, Wurlitzer, Adagio, Hailun, Ritmuller, Pearl River, Yamaha Disklavier, August Forester, Grotrin Steinweg, Sauter, Schulze Pollman and Hardman Peck. Also digital pianos from Roland, Kurzweil, Yamaha Clavinova, Casio, AvantGrand, The One, Dynatone, and Korg. Finally, we carry player piano systems from Pianomation, Piano Disc and QRS, Pianoforce and Live Performance LX.

Copyright © 2016 HollywoodPiano, SEO & Digital Marketing by Go Big

*Id.* at 110 (Treibitz Disc. Tr. Ex. 5).

### III. Standing

Petitioner is named after the Schiedmayer family known for keyboard musical instruments, is owned by a member of that family and uses SCHIEDMAYER as a trademark for keyboard musical instruments in the United States. 38 TTABVUE 4-7 (Schiedmayer Dec. p. 1-4). This establishes that it has a personal stake in this proceeding, and is not an intermeddler. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014); *Bos. Athletic Ass'n v. Velocity*, 117 USPQ2d 1492, 1494-95 (TTAB 2015). *See generally Association pour la defense et la Promotion de L'oeuvre de Marc Chagall dite Comite Marc Chagall v. Bondarchuk*, 82 USPQ2d 1838, 1842 (TTAB 2007) (committee which defends the rights and work of Marc Chagall had standing to challenge registration of MARC

14

CHAGALL for vodka); *Estate of Biro v. Bic Corp.*, 18 USPQ2d 1382, 1385 (TTAB 1991) (estate of ball point pen inventor had standing to challenge registration of inventor's surname for ball point pens).

## IV. False Suggestion of a Connection

To prevail on its false suggestion claim, Petitioner bears the burden of proving that SCHIEDMAYER is "unmistakably associated with a particular personality or 'persona.'" *Univ. of Notre Dame Du Lac v. J.C. Gourmet Food Imps. Co., Inc.*, 703 F.2d 1372, 217 USPQ 505, 509 (Fed. Cir. 1983). To make this showing, Petitioner must establish that: (1) the mark is the same as, or a close approximation of, Petitioner's previously used name or identity; (2) the mark would be recognized as such, in that it points uniquely and unmistakably to Petitioner; 3) Petitioner is not connected with the activities performed by Respondents under the mark; and 4) Petitioner's name or identity is of sufficient fame or reputation that when Respondents use the mark in connection with their goods or services, a connection with Petitioner would be presumed. *Id.*; *Bos. Athletic Ass'n*, 117 USPQ2d at 1495; *Bondarchuk*, 82 USPQ2d at 1842; *Hornby v. TJX Cos., Inc.*, 87 USPQ2d 1411, 1424 (TTAB 2008); *Buffett v. Chi-Chi's, Inc.*, 226 USPQ 428, 429 (TTAB 1985).

### A. Is SCHIEDMAYER the Same as Petitioner's Previously Used Name or Identity?

Petitioner is Schiedmayer Celesta GmbH, with "celesta" merely identifying Petitioner's primary keyboard product and GmbH merely being a German entity designation. In other words, Schiedmayer is Petitioner's name and identity. Respondents have registered the exact same name. *See In re White*, 73 USPQ2d 1713,

1719 (TTAB 2004) ("Just as an applicant cannot take another's name and add matter to it to avoid a refusal of false suggestion under Section 2(a), an applicant cannot take a significant element of the name of another and avoid a refusal by leaving one or more elements behind, provided that that which has been taken still would be unmistakably associated with the other person."); *see also In re Jackson Int'l Trading Co.*, 103 USPQ2d 1417, 1419 (TTAB 2012) ("We find that the commercial impression engendered by applicant's mark [BENNY GOODMAN COLLECTION THE FINEST QUALITY (stylized)] is that there is a 'Benny Goodman' collection of products which makes applicant's mark a close approximation of the name Benny Goodman.").

Petitioner prominently promotes its connection to the Schiedmayer family and its continuation of the Schiedmayer family tradition of offering keyboard musical instruments. 38 TTABVUE 16-27, 33-70 (Schiedmayer Dec. Exs. A, B, D). This is clear from Petitioner's promotional materials and articles about Petitioner:



38 TTABVUE 21, 33 (Schiedmayer Dec. Exs. B, D). Moreover, Petitioner is owned by Elianne Schiedmayer, who is a member of the well-known Schiedmayer family,

another in a long line of Schiedmayer family members in the keyboard musical instrument business and the literal and figurative heir to Schiedmayer family businesses. 38 TTABVUE 7, 29-31 (Schiedmayer Dec. p. 4 and Ex. C); 73 TTABVUE 4 (Schiedmayer Rebuttal Dec. p. 1). *See In re Sauer*, 27 USPQ2d 1073 (TTAB 1993), *aff'd*, 26 F.3d 140 (Fed. Cir. 1994) (finding that a wide variety of products bearing the name Bo Jackson establish that "Bo" is Mr. Jackson's name or identity); *Buffett*, 226 USPQ at 430 (finding that promotional materials and press reports associating MARGARITAVILLE with Jimmy Buffett tend to support a finding that the term is Buffett's identity). While Petitioner is known formally as "Schiedmayer Celesta GmbH," the record, including encyclopedia entries, Internet search results and media mentions, reveals that Petitioner and its instruments are known to and by the public as "Schiedmayer." *In re White*, 73 USPQ2d at 1719; *cf. In re Urbano*, 51 USPQ2d 1776, 1779 (TTAB 1999) ("while the general public in the United States may or may not have seen the upcoming Olympic Games referred to precisely as 'Sydney 2000' we have no doubt that the general public in the United States would recognize this phrase as referring unambiguously to the upcoming Olympic Games in Sydney, Australia, in the year 2000").

The fact that other Schiedmayer family-affiliated companies have previously also offered keyboard musical instruments does not mean that SCHIEDMAYER is not Petitioner's identity, especially where Petitioner's founder and chief executive is the

heir to some of those companies.[11] In fact, "the statute clearly contemplates refusal of matter that would falsely suggest a connection with multiple persons, whether natural or juristic, or with multiple institutions." *In re White*, 73 USPQ2d at 1717-18. In *White* we rejected the "contention that because none of the federally-recognized Apache tribes goes by the name APACHE alone and each has one or more other terms in its name, APACHE per se cannot be found to be the name or equivalent thereof of these tribes." *Id.* at 1719. In short, SCHIEDMAYER is Petitioner's name or identity.

## B. Would SCHIEDMAYER Be Recognized As Petitioner's Name or Identity, Pointing Uniquely and Unmistakably to Petitioner?

In determining whether SCHIEDMAYER would be recognized as Petitioner's name or identity, the question is whether it points "uniquely and unmistakably" to Petitioner "in the context of the [Respondents'] goods." *Hornby*, 87 USPQ2d at 1424, 1426-27; *White*, 73 USPQ2d at 1658; *Wielinski*, 49 USPQ2d at 1757. It does.

All of the evidence indicates that the name SCHIEDMAYER is associated with a family that has been prominent in the keyboard musical instrument industry for hundreds of years. Respondents do not even suggest another meaning for SCHIEDMAYER.[12] In fact, Mr. Treibitz admits to knowing about the Schiedmayer

---

[11] This is not a case where SCHIEDMAYER is no longer in use, or in which Petitioner's connection with SCHIEDMAYER keyboard musical instruments is in dispute. *Cf. In re Wielinski*, 49 USPQ2d 1754, 1758 (TTAB 1998) ("There could be someone who stands in the shoes of the former truck company, but this record does not establish who that might be."), *overruled in part on other grounds*, *In re WNBA Ent. LLC*, 70 USPQ2d 1153 (TTAB 2003).

[12] Respondents' argument that SCHIEDMAYER would point to a number of people because it is a surname is not well-taken, nor is Respondents' attempt to impose on Petitioner a higher burden of proof on this factor. Indeed, the record here clearly shows that the name

18

family and SCHIEDMAYER keyboard musical instruments, and admits that he only filed the application underlying the Registration when he believed that the SCHIEDMAYER mark had been abandoned. 66 TTABVUE 7-9 (Treibitz Dec. pp. 2-4).[13]

Furthermore, in the context of pianos, celestas and other keyboard musical instruments, SCHIEDMAYER has only one meaning — it points uniquely, and unmistakably, to the SCHIEDMAYER family of which Elianne Schiedmayer is a member, and to the family's businesses which have long offered keyboard musical instruments. The record reveals that Petitioner is the SCHIEDMAYER family business which currently offers SCHIEDMAYER keyboard musical instruments in the United States.

Respondents' argument that third parties are offering or at one time offered SCHIEDMAYER-branded keyboard instruments and therefore that the name does not point uniquely and unmistakably to Petitioner is not well-taken. There is no evidence that anyone other than Petitioner and Respondents are currently using SCHIEDMAYER for keyboard musical instruments in the United States, and to the extent that others may have used the term in the United States at one time, there is no evidence that this use was unauthorized, that it continues or that it had any effect

---

SCHIEDMAYER, which is Petitioner's name, enjoys fame and recognition in connection with keyboard musical instruments, which is Petitioner's field.

[13] We need not find that Petitioner owns United States trademark rights in SCHIEDMAYER in order to find that Respondents' use of SCHIEDMAYER falsely suggests a connection with Petitioner.

on the public perception of the SCHIEDMAYER name as referring to Petitioner.[14]

Nor does the one-time existence of other Schiedmayer family-affiliated businesses which used SCHIEDMAYER as a mark detract from the finding that SCHIEDMAYER now points uniquely and unmistakably to Petitioner. The applicant in *In re Peter S. Herrick, P.A.*, 91 USPQ2d 1505 (TTAB 2009) made a somewhat analogous argument when his application to register U.S. CUSTOMS SERVICE & Design was refused because that was the former name of U.S. Customs and Border Protection, a U.S. government agency. Applicant's claim that his mark did not point uniquely and unmistakably to the U.S. Customs Service, because it no longer existed, was rejected:

> Applicant's use of the former U.S. Customs Service seal in connection with its offer of legal services "concentrating" on U.S. customs law is strong evidence that applicant is attempting to draw a connection between its services and the agency that oversees customs issues, especially because a segment of the public still uses U.S. Customs Service to refer to United States Customs and Border Protection. Finally, the name "U.S. Customs Service" has meaning only as a governmental agency. The only entity the name "U.S. Customs Service" could possibly identify is the government agency and, therefore, it is associated only with United States Customs and Border Protection.

*Id.* at 1508. Here, the same logic applies – Respondents' use of SCHIEDMAYER on keyboard musical instruments is strong evidence that they seek to draw a connection

---

[14] As Petitioner points out, Respondents' arguments on this issue appear to be based only on printed publications and Internet printouts, which are not admissible for the truth of the matters asserted therein. *Ayoub, Inc. v. ACS Ayoub Carpet Serv.*, 118 USPQ2d 1392, 1399 n.62 (TTAB 2016); *Nat'l Pork Bd. and Nat'l Pork Producers Council v. Supreme Lobster and Seafood Co.*, 96 USPQ2d 1479, 1483 (TTAB 2010).

between their goods and Petitioner, the prominent source of SCHIEDMAYER keyboard musical instruments in the United States. In fact, in the field of keyboard musical instruments, the only entity SCHIEDMAYER "could possibly identify," *id.*, is Petitioner. The record thus establishes that SCHIEDMAYER points to Petitioner uniquely and unmistakably.

## C. Is Petitioner Connected to Respondents or Their Activities?

Respondents concede that they are not connected in any way to Petitioner. 35 TTABVUE 4 (Answer ¶ 8) ("Respondents admit that they have had no formal business relationship with Petitioner."); 76 TTABVUE 23 (Respondents' Trial Brief at 17) ("The Respondent agrees that they are in no way connected with the goods sold or the activities performed by Petitioner.").

## D. Is SCHIEDMAYER Sufficiently Famous That When Respondents Use the Name a Connection Between the Parties Would be Presumed?

The inquiry under this Section 2(a) factor differs from the traditional likelihood of confusion or dilution analyses of fame in that "the key is whether the name per se … as *used* would point uniquely to the person or institution." *White*, 73 USPQ2d at 1720. Here, the Schiedmayer name and family has been associated with keyboard musical instruments for centuries. Schiedmayer keyboard musical instruments have won many awards, are used by prominent United States orchestras, a Schiedmayer keyboard musical instrument is on permanent display at the Boston Museum of Fine Arts, and Internet reference works and search results identify SCHIEDMAYER with keyboard musical instruments from the Schiedmayer family and essentially nothing

else.[15] This establishes that SCHIEDMAYER is sufficiently famous in the United States that Respondents' use of it would lead to a presumption that the parties are somehow connected.[16]

In light of the evidence that SCHIEDMAYER is famous in the United States in connection with keyboard musical instruments,[17] and given Respondents' use of SCHIEDMAYER for keyboard musical instruments, "we may draw an inference that [Respondents] inten[d] to create a connection with" Petitioner, and that the public would make the false association. *In re Peter S. Herrick, P.A.*, 91 USPQ2d at 1509 (citing *In re N. Am. Free Trade Ass'n,* 43 USPQ2d 1282, 1285 (TTAB 1997) (quoting *Univ. of Notre Dame*, 217 USPQ at 509)).[18]

---

[15] We have not considered the Internet reference works and search results for the truth of the matters asserted therein, but only for what they show on their face, specifically that certain searches and materials point to Ms. Schiedmayer's family and its businesses and their musical instruments.

[16] We have focused on the evidence of Petitioner's fame and reputation in the United States, but have also considered the degree to which Petitioner is famous abroad. *See Hornby*, 87 USPQ2d at 1416 ("Because evidence of fame or reputation in other countries may have relevance to the extent that consumers in the United States would be aware of her as a result of these activities, we will not exclude this evidence, but will give it only the probative weight to which it is entitled."). To be clear, however, the SCHIEDMAYER name is sufficiently famous in the United States to find for Petitioner on its false suggestion claim, even if we did not consider any evidence from abroad.

[17] Respondents concede that Petitioner "may have some level of fame or reputation" for celestas (described above) and glockenspiels (a percussion instrument which may have a keyboard), but argue that this fame or reputation does not carry over to pianos. 76 TTABVUE 24 (Respondents' Trial Brief at 18). The argument is not well-taken. As shown above, the differences between celestas and pianos are internal, mechanical and perhaps not even noticeable to or known by some consumers of keyboard musical instruments. Celestas and pianos are so similar that Respondents' use of the SCHIEDMAYER name for pianos would result in consumers making a false association between the parties.

[18] Petitioner makes clear that the references in its Trial Brief to "palming off" are not to a separate ground for cancellation. 75 TTABVUE 21 (Petitioner's Trial Brief at 13) ("Plaintiff

### E. Conclusion Regarding False Suggestion Claim

Petitioner has established each of the four factors, and thus that use of Respondents' mark would falsely suggest a connection between the parties.

## V. Laches/Acquiescence

Although Respondents have asserted "laches" and "acquiescence" as separate affirmative defenses, it is clear that Respondents are using the two terms to describe the same conduct (or lack thereof) by Petitioner, and that Respondents' defenses are based on the same legal theory. Indeed, Respondents' fourth affirmative defense is pleaded as follows: "Petitioner's Petition for Cancellation is barred by laches. Petitioner did not seek cancellation of the Respondent's registration for nearly 7.5 years." Respondents' pleading of their fifth affirmative defense is substantively the same: "Petitioner's Petition for Cancellation is barred by acquiescence. Petitioner did not seek to cancel Respondent's registration for such a long period of time that it amounts to a relinquishment of any claims by Petitioner to cancel it." 35 TTABVUE 6-7. Not only is the basis for both pleaded defenses essentially the same, but in their Trial Brief Respondents discuss "laches" under its own heading, but do not separately address "acquiescence." 76 TTABVUE 34-38 (Respondents' Trial Brief at 28-32). *See generally Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc.*, 971 F.2d 732, 23 USPQ2d 1701, 1703 (Fed. Cir. 1992) ("While laches and estoppel are entirely separate

---

wishes to emphasize that this Petition to Cancel is not based upon Defendants' palming off of Plaintiff's products. Rather, Plaintiff is calling attention to Defendants' acts of palming off as it establishes intent, which is a strong element in finding a 2(a) violation ...."). We have therefore considered Petitioner's allegations of "palming off" only to the extent that they relate to Petitioner's claim of false suggestion of a connection.

defenses … in this case both defenses turn on essentially the same facts."). Here, Respondents' laches defense subsumes their acquiescence defense.

"The elements of laches are (1) unreasonable delay in assertion of one's rights against another; and (2) material prejudice to the latter attributable to the delay." *Lincoln Logs*, 23 USPQ2d at 1703. In this case, and Board proceedings generally, laches "must be tied to a party's registration of a mark *not* to a party's use of the mark." *Lincoln Logs*, 23 USPQ2d at 1703. "[L]aches is available against a false suggestion claim." *Hornby v. TJX Cos., Inc.*, 87 USPQ2d 1411, 1419 (TTAB 2008) (citing *Bridgestone/Firestone Research Inc. v. Automobile Club de l'Ouest de la France*, 245 F.3d 1359, 58 USPQ2d 1460, 1462 (Fed. Cir. 2001)).

### A. Was the Delay Unreasonable?

The facts surrounding Petitioner's delay are somewhat murky. Petitioner argues that it learned about the Registration's existence "in connection with the filing of its own trademark applications" in April 2015, but does not specifically state when in relation to the preparation, filing and examination of the application it learned about the Registration; nor does Petitioner state when it learned of Respondents' use. 75 TTABVUE 35 (Petitioner's Trial Brief at 27). Respondents point out that sometime after Mr. Treibitz registered the domain name "schiedmayer.com" in August 2002, Elianne Schiedmayer called him to discuss the domain name, and argue that "[a]t the very least Petitioner should have known that a trademark application may have been filed and been put to inquiry as to whether one existed following the [conversation] with Mr. Treibitz regarding his intentions with the mark." 76 TTABVUE 35 (Respondents' Trial Brief at 29). In any event, there is no dispute that the

24

Registration's underlying application was published for opposition on June 22, 2004, and the Registration issued on November 30, 2007.

"[L]aches begins to run from the time action could be taken against the acquisition by another of a set of rights to which objection is later made. In an opposition or cancellation proceeding the objection is to the rights which flow from registration of the mark." *Nat'l Cable Television Ass'n v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 19 USPQ2d 1424 (Fed. Cir. 1991). Thus, in cases where a plaintiff has actual knowledge of the defendant's trademark use, or its application, laches begins to run from the date of publication of the application, but where the plaintiff does not have actual knowledge of a party's use or application to register a mark before the close of the opposition period, laches begins to run from the date the registration issues. *Ava Ruha Corp. v. Mother's Nutritional Ctr., Inc.*, 113 USPQ2d 1575, 1580 (TTAB 2015) ("in a cancellation proceeding, laches begins to run no earlier than the date the involved mark was published for opposition (if there was actual knowledge), and no later than the issue date of the registration (when Plaintiff is put on constructive notice, see 15 U.S.C. § 1072)"); *Jansen Enters. Inc. v. Israel Rind and Stuart Stone*, 85 USPQ2d 1104, 1114 (TTAB 2007); *Teledyne Techs., Inc. v. W. Skyways, Inc.*, 78 USPQ2d 1203, 1210 & n.10 (TTAB 2006), *aff'd* 208 F. App'x. 886 (Fed. Cir. 2006).

Here, Petitioner did not petition to cancel the Registration until almost seven and one-half years after it issued, and after Respondents filed their declarations under Sections 8 & 15. This delay was fairly long, and in the absence of extenuating circumstances or an excuse, unreasonable. *See Bridgestone Firestone*, 58 USPQ2d at

25

1463 (finding unreasonable delay based in part on "the absence of a reasonable excuse by the Automobile Club for its inaction"); *Alfacell Corp. v. Anticancer, Inc.*, 71 USPQ2d 1301, 1307 (TTAB 2004) (finding seven year delay unreasonable where "Petitioner has been completely silent as to the reason for its delay"); *Turner v. Hops Grill & Bar Inc.*, 52 USPQ2d 1310, 1312 (TTAB 1999) (finding five year delay unreasonable where "the only reason petitioner presented for his delay is his lack of actual knowledge," pointing out that actual knowledge "is not the appropriate measure, and the length of the delay is clearly substantial"). Here, because Petitioner had at least constructive knowledge of the Registration since its date of issuance, November 20, 2007, and has provided no excuse for not filing the petition to cancel until April 1, 2015, seven and one-half years later, we find that Petitioner's delay is unreasonable.

## B. Have Respondents Suffered Material Prejudice Attributable to the Delay?

Mere delay is not enough to establish Respondents' laches defense, however. Indeed, to meet their burden of proving that laches bars Petitioner's claims, Respondents must establish that they suffered harm as a result of the delay. *Ralston Purina Co. v. Midwest Cottage Co.*, 373 F.2d 1015, 153 USPQ 73, 76 (CCPA 1967) (respondent "bears the burden of showing the injustice"). *See also Bridgestone/Firestone*, 58 USPQ2d at 1462; *Charette Corp. v. Bowater Comm'n Papers Inc.*, 13 USPQ2d 2040, 2043 (TTAB 1989) ("There can be no question that mere delay in asserting one's trademark rights is insufficient to give rise to an

estoppel. More is needed."); *Trans Union Corp. v. Trans Leasing Int'l Inc.*, 200 USPQ 748, 755 (TTAB 1978).

Here, Respondents have not met their burden. The entirety of their argument that they have suffered material prejudice is "the Respondent sold and rented SCHIEDMAYER branded pianos continuously for seven years." 76 TTABVUE 36 (Respondents' Trial Brief at 30). The entirety of the evidence Respondents provided in support of this argument is Mr. Treibitz's "general recollection" unsupported by documentary evidence that Respondents sold at most 17 SCHIEDMAYER-labeled pianos between issuance of the Registration and the filing of the petition to cancel in 2015. 71 TTABVUE 25 (Treibitz Test. Tr. 22); 66 TTABVUE 10 (Treibitz Dec. p. 5) (claiming that Respondents sold approximately 12 pianos bearing the SCHIEDMAYER mark in 2016 and 2017). Respondents provide no information about any advertisement or promotion of SCHIEDMAYER-labeled pianos specifically, as opposed to general advertising of all brands on offer. Nor have Respondents shown any other "material prejudice" attributable to Petitioner's delay.

This showing falls short, and calls to mind *Ralston Purina*, in which the respondent did not make a "serious effort to show prejudice to itself." *Ralston Purina*, 153 USPQ at 76. The Court found that the respondent did not establish material prejudice and that laches did not apply, for reasons equally applicable here:

> We have no evidence of promotional expenditure. Sales data are too imprecise even to indicate any substantial growth of registrant's trade in the six-month period between petitioner's alleged acquiescence and first assertion of right in the mark for baler twine … We do not scan petitioner's history for one fatal misstep. We sustain

> petitioner's rights in the absence of a showing that to do so
> would work *injustice.*

*Id.* at 76-77. Similarly, in *Alfacell*, the Board found the evidence of prejudice insufficiently specific, because "it is difficult to gauge, in the absence of dollar amounts or other specific information relative to its promotional efforts, the degree to which there has been any detriment." *Alfacell*, 71 USPQ2d at 1308. *See also Hornby*, 87 USPQ2d at 1419 (unsupported claim that investment was made in a mark not credited); *Charrette Corp.*, 13 USPQ2d at 2043 (no laches where "registrant has submitted no evidence to show that it acted to its detriment in reliance on petitioner's failure to act more promptly"); *Cf. Bridgestone Firestone*, 58 USPQ2d at 1463 ("Bridgestone asserted economic prejudice, presenting evidence of its longstanding investment in and promotion of the LEMANS brand of tires, including use of the mark on at least four types of tires manufactured by Bridgestone … Bridgestone presented testimony on the advertising of the LEMANS brand and the role of the LEMANS brand in Bridgestone's marketing structure … It was undisputed that Bridgestone invested in and promoted the LEMANS brand tires over this lengthy period, during which the Automobile Club was silent."); *Ava Ruha*, 113 USPQ2d at 1583 (finding material prejudice based on showing of tens of millions of dollars spent on growing a business, adding at least 15 stores and spending over $7 million promoting its marks); *Turner*, 52 USPQ2d at 1313 ("Looking at the evidence from 1992, when petitioner was put on constructive notice of respondent's mark, respondent had four restaurants in Florida. By 1994 it had nine restaurants; during 1995 respondent opened four new restaurants … In 1996 five new restaurants were

opened, and twelve were added in 1997. Its sales during this period of time went from approximately $7 million to $58 million, and the business continues to grow.").

Here, while the record includes a few of Respondents' advertisements, there is no evidence regarding how widely they were distributed or seen, and in those advertisements Respondents promoted not just SCHIEDMAYER-labeled pianos, but also pianos bearing a number of other, unrelated marks. *See Alfacell*, 71 USPQ2d at 1308 ("respondent's testimony regarding its appearances at conferences, trade shows and presentations is diminished by the fact that it was promoting other drugs at the same time … respondent might very well have attended the various trade shows and conferences to promote its other drugs even if its ONCASE brand drug had not been developed"). Moreover, and perhaps more importantly, Respondents' claim of prejudice rings hollow where the only direct, marginal expense incurred in selling SCHIEDMAYER-labeled pianos is buying the SCHIEDMAYER labels from trophy or decal makers. Indeed, virtually all of the money Respondents spent to offer SCHIEDMAYER-labeled pianos related to acquisition of the no-name pianos themselves, which could just as easily be labeled something else. It is obvious that the costs of acquiring pianos will dwarf the negligible cost of buying labels from trophy or decal sellers, and that re-labeling the pianos as something other than SCHIEDMAYER would be quick, easy and inexpensive. In any event, Respondents have produced no evidence to the contrary, much less established any material prejudice arising from changing the names on stencil pianos.

"Economic prejudice arises when a defendant suffers the loss of monetary investments or incurs damage that likely would have been prevented by an earlier suit. … A nexus must be shown between the delay in filing suit and the expenditures; the alleged infringer must change his position because of and as a result of the plaintiff's delay." *Alfacell*, 71 USPQ2d at 1307. Here, Respondents have not shown any meaningful economic or other damage resulting from Petitioner's delay in seeking to cancel the Registration, or any significant change of position as a result of Petitioner's delay. Because material prejudice is a necessary element of any laches defense, Respondents have not met their burden of establishing that the petition is barred by laches.

## VI. Conclusion

Because Respondents have used Petitioner's unique name and identity in connection with keyboard musical instruments similar to those for which Petitioner and the Schiedmayer family are famous, use of Respondents' mark will falsely suggest a connection between Petitioner and Respondents. We need not reach Petitioner's abandonment claim. *See Azeka Bldg. Corp. v. Azeka*, 122 USPQ2d 1477, 1478 (TTAB 2017) (Board has "discretion to decide only those claims necessary to enter judgment and dispose of the case") (quoting *Multisorb Tech., Inc. v. Pactive Corp.*, 109 USPQ2d 1170, 1171, 72 (TTAB 2013)).

**Decision:** The petition is granted and the Registration will be cancelled in due course.